Last case for this morning is 22-1409 Minocal v. GEO Group. Counsel for Appellant, if you'd make your appearance and proceed. Good morning, Mr. Chief Judge, and may it please the Court, I'm Dominic Dre, and with Christopher O'Brien, I represent the Appellant GEO Group. I will try to save three minutes for rebuttal. Plaintiffs have a policy disagreement with the Department. I'm going to jump right in because before we go to the merits, I have some real questions about whether we even have jurisdiction to hear this matter. Why should we do this as an interlock? Yes, well, I mean, I think the Court has actually answered that question itself in Chavez v. Singer, as have three circuits in other DSI cases. Those three, of course, have all post-dated the two cases on the other side of a conceded circuit split on the issue. So I think the Court turns then to, first of all, its own precedent. As I mentioned, this Court has recognized the immediate appealability of Barr v. Mateo, federal officer immunity in Chavez, and qualified immunity, the closest analog to DSI in the estate of Booker and many other cases. Well, I'm not sure qualified immunity is that close. I guess it depends on if we're talking about immunity from suit or immunity from damages. And as I look at the district court record, I don't think that there was any argument that it's immunity from suit, just that it's immunity from damages. And I don't see any reason why that can't wait and be dealt with on appeal. So if it was a defense, if Earsley was a defense just on damages, then that would be correct. It is not, however, just a defense on damages. As the Earsley Court itself recognized, it's an immunity. And those, the circuits, I think it's the 2nd, 6th, and 11th circuits that have come out this way in ACT, that's the 6th circuit case, World Trade Center is the 2nd, and McMahon in the 11th circuit, they have all recognized that it's an immunity from suit. Well, those are not the same thing. They're not contractor liability or derivative immunity. ACT is 11th amendment immunity. World Trade Center is Stafford Act immunity. And so I don't, we don't have, those pieces. And McMahon is Ferez common law. Right, Ferez is, right, it's a military issue. So you're. So, so we're not dealing, those aren't dealing with the same issues. So these are not controlling, well, even if they were controlling on us, they might be analogous, but they're not the same. Well, respectfully, I actually disagree with that point. These are all derivative sovereign immunities. The source of the sovereign's immunity changes in each of them. One is constitutional, one is statutory, and one is common law. But where the source of the sovereign's immunity comes from doesn't change the fact that contractors who are carrying out the same work as the sovereign side by side enjoy the same immunity. This is the whole insight of those three cases. On the other side of the split, by the way, you have what the Second Circuit characterizes as a sweeping and entertaining analysis by the Seventh Circuit, which in Pullman just rejects the notion that sovereign immunity exists anymore in the United States. Well, it's debatable whether this is derivative sovereign immunity to begin with. And second, your argument about this being most analogous to qualified immunity, there seem to be considerations at play in qualified immunity that just aren't at play here. I mean, you're talking about, as Opposing Count pointed out in their jurisdictional briefing, you're talking about a situation where a public officer's exercise of discretion in unclear circumstances is being protected in qualified immunity. One, in this situation you have a private actor. Two, the whole premise is you're not supposed to be exercising discretion. You're supposed to be doing what you're told to do. And so why is it most analogous, and in particular to the extent that you can address the arguments that were raised in their response on the jurisdictional briefing, I'd appreciate it. Yes, of course, Your Honor. I think the answer lies in the Supreme Court's Filarski decision, which, if you recall, is the one where a fire department hires a private lawyer to conduct an investigation. He does a job that at least the plaintiff in that case thought was subpar and brings suit. This private person asserts derivative qualified immunity, and the Supreme Court says, of course. The reason is that, and the Court's opinion in that case is tremendous, but particularly pages 390 and 391 of the Filarski decision articulate, and if you'll indulge my reading a sentence of it, the public interest in ensuring performance of government duties free from the distractions that can occupy even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. And the Court goes on to explain that there's a spillover to the government employees who would in that case be called as witnesses, just as they will here, by the way. The ICE employees who maintain permanent offices at the Aurora ICE processing center will be called as witnesses in this case. Derivative sovereignty, I mean, these folks work hand-in-hand. As the lower court opinion noted, Plaintiff Valerga, this is at page 23 of the opinion, alleges that it was an ICE employee, not a GO employee, who told him that if he didn't clean up, he could go to solitary confinement. They work side-by-side, the exact same people working hand-in-hand, and one of them could be left, as Filarski says, left holding the bag for doing the exact same activity. So that's why it's important to recognize, and this is the compelling interest, which goes to the sort of the fourth of the three Cohen factors about asserting a government interest in the immunity in question, to hear it under collateral order appeal. Yes, but your argument just then also raises the specter of the second Cohen factor, I think, which relates to intertwined with the merits. I believe that's the second one. Well, I mean, if we have to do that sort of inquiry, that inquiry is smack dab in the middle of the merits of the matter. I don't see how this sort of appeal is going, where you have to determine whether you had direction, and in some sense, whether you exceeded the scope of that direction, which will determine whether you get immunity or not, why that isn't flatly at the center of what the merits challenge is. Well, I don't think that's correct. So the, whether or not you're authorized and directed by the federal government, and I'm thrilled to hear the court using the Campbell-Ewald standard rather than the Ninth Circuit standard on that point, but whether or not you're authorized and directed is totally separate from our defenses, of which there are many under, for example, the TVPA, which we argue, or will argue if we have to, but shouldn't, is, doesn't apply, this isn't forced labor within the statutory meaning. There's a similar argument under unjust enrichment. Those are merits defenses. Whether you're authorized and directed by the government to operate a voluntary work program and pay a dollar a day, and whether you're authorized and directed by the government to insist that capable people pick up after themselves, those are questions totally apart from the merits. That if, for example, I can actually put a sharper point on this. If I'm wrong on the directed point, then it would seem on the merits that they have to be right on all housekeeping being forced labor. But this court doesn't need to answer that at this stage. All we need to decide is whether or not, excuse me, all you need to decide is whether or not it was authorized and directed by the government. And on that score, there can be no doubt that the federal government authorized and directed these actions. We identify in the briefs, I think at least half a dozen sources of authorization and direction for personal housekeeping as opposed to common area housekeeping. Correct. So the court below does a strange thing, which I find nowhere in the record, by the way, where it says you're responsible under the government's directions to clean up your personal space, which is sort of undefined, and then your stuff, the messes you've made in the common areas. I don't see that anywhere from the government, but throughout the authorization documents, and here there are many of them, the PBNDS refers to your assigned living area, which includes the whole area to which you're assigned. Assigned living areas is, I don't think, really disputed. The handbook talks about, that's the national detainee handbook from ICE, talks about your living unit, which encompasses both the residential, the restrooms, and the common, the day area. The supplement from which, you know, that's a document that GEO writes, but that ICE reviews and approves. The supplement talks about housing unit at least three times, and I can give the court a flurry of appendix citations for these. For the PBNDS, take a look at page 215 of the appendix and 141. Those are also, by the way, connected to the disciplinary scale, so 215 says refusal to, quote, clean your assigned living area, maps onto page 216 of the appendix, which gives the disciplinary scale that comes from ICE. GEO has nothing to do with developing that disciplinary scale. The handbook, those are at ECF 51-3 and 310-1. The supplemental document that we prepare and ICE reviews and approves, 243 through 44, and then we talk in the reply brief at some length about the appropriation. This is turning to the Voluntary Work Program of exactly $1 from Congress, which, you know, they've tried to change the law sometimes, and they haven't succeeded in doing it, but the appropriation remains $1. ICE pays $1 in its own facilities. But it's the standard change. There's a period of time where you are authorized to pay $1, and then later it's at least $1. Correct. And there's also evidence that at other facilities you paid more. That's correct. So it doesn't sound like you thought that you were ordered somehow to only pay $1. So that's the difference in the legal standard. So if I can take Your Honor's question in two parts, the first is, yes, you're entirely correct. Until 2013, when Modification 5, as it's known, kicks in in the contract, it says pay $1 a day. So even under the district court's mistaken standard that requires no discretion, we should have gotten summary judgment for that first window. Then in 2013, for the last year and a half or so of the class period, it switches to at least $1 a day. And here is where the big fight about the standard for how much discretion really takes effect. And I'll call the Court's attention to Campbell-Uwald at pages 175 through 176, and then also at 167, note 7, which says the question is whether they complied or performed, quote, in compliance with all federal directions, end quote. And that, by the way, comes up in the context of narrowing the Ninth Circuit's approach to DSI or correcting the Ninth Circuit's approach to DSI. But that question, in compliance with all federal directions, if the direction is to pay at least $1 a day, and you pay $1 a day, you have complied with that federal direction. So with that, I would like to reserve time. I don't think there's anything in Campbell-Uwald that would say that by paying $1 a day, you've somehow insulated yourself from any claim that you violated some other law. I mean, you certainly had the ability to assess whether more was required, and nothing about what you were told by the government would have prevented you from paying more. So, respectfully, I don't think that's correct. First of all, the test is not whether you were precluded from paying more, because think of the burden that puts on the government. Now they need to foreclose all possible discretion in order to avoid their contractors getting sued? There's nothing in the Supreme Court authority that says somehow the mission here is to make sure you give the greatest immunity to government contractors possible. I mean, we're looking at a narrow situation, and certainly a narrow situation whether you can immediately appeal it. And in Campbell, you had not only were they violating the law, they were also violating the specific instructions from the Navy. Correct. So it's not our case at all. So that's why they lost. That's why they lost. But the court still announces the rule, and then they conclude that that contractor failed, whereas we would certainly satisfy it, again, for the exact provisions or exact portions that I just cited. With that, I'll save what I have left for rebuttal. May it please the court, Jennifer Bennett on behalf of the appellees. And I'll start with jurisdiction, because I think that's dispositive here. And before getting to the specific arguments that Geo makes, I just want to take a step back and emphasize what the collateral order doctrine is, which is essentially a narrow, judge-made safety valve from a statute that by its terms has no exceptions. The statute says appellate courts have jurisdiction only over final orders. And because this is a narrow, judge-made doctrine, that's why the Supreme Court has emphasized over and over again that the requirements for applying this doctrine must be treated stringently. Otherwise, we're not so much interpreting the statute as rewriting it. And there are two of the Supreme Court's stringent requirements, at least two, that is, that yearsly appeals fail. One, the requirement that an appeal be effectively unreviewable, or rather an issue be effectively unreviewable after final judgment. And the second is that it be an important issue that's entirely separable from the merits. Neither is true with yearsly appeals. And I want to start- Let me stop you on the first one. If, in fact, it's immunity from suit, then review after the lawsuit isn't effective, is it? I don't think that's correct. And I think the Supreme Court's decision in Will v. Halleck actually answers this question directly. So what the court said in Will is it said the question to determine whether a judgment is effectively reviewable is not about whether it can be characterized in immunity from suit. What it's about is whether waiting until after final judgment will, and this is a quote, imperil a substantial public interest. And I think Will essentially forecloses the argument they're making here. And if you look at Will, it's almost on all fours, with two exceptions. The defendants in Will were actually government employees. And there was a statute in that case. In that case, the statute at issue said if there had previously been a judgment, that's a bar to any action. That is an immunity from suit, where the statute says there can be no action. And even in that case, the Supreme Court held that the collateral order doctrine doesn't apply. And it did so by rejecting the very arguments Geo's making here. What the government employees said in Will is they said this is no different from the qualified immunity context. We have freedom from suit, and here it's protected by statute. And if you wait till the end, till after final judgment, you'll be imposing costs on the government. You'll be making it more difficult for the government to do its work. And you'll be deterring people, you know, government employees from signing up to work for the government. And what the Supreme Court said, the Supreme Court said that's not enough. It's not enough that you're telling me it's an immunity from suit. It's not enough that you're telling me that litigation or liability is going to impose these kinds of costs on the government. The reason that qualified immunity is immediately appealable is not because of the imposition on the government. It's not because you can call it an immunity from suit. It's because there's this very special interest in qualified immunity, and that's ensuring that government officials are going to show reasonable initiative in the face of unclear law. And she hasn't even tried to argue that that interest is at stake here, and it couldn't because of the Supreme Court's decision in Richardson. You know, Richardson looked at the history. There's a very long history of private companies operating detention centers, and Richardson looks at that very long history and says, we have never given immunity to private companies operating detention centers or their employees. And in response to the argument, well, they should get qualified immunity, the Supreme Court says, no, that's different. The point of qualified immunity for people who are employed directly for the government is to preserve initiative. And with a private company, market pressures are going to do that. We don't need that. And that's the difference between Richardson and Filarski, which is the case that GEO relies on. Filarski is about individuals employed directly by the government. It's not a private company. It's not people employed by a private company. And the only question in Filarski was, if you're employed by the government in a short-term sort of way or for a particular project, or if you have another private practice on the side, do you get the same qualified immunity as full-time government employees? And Filarski made the distinction that Richardson makes between individuals employed directly by the government and private companies. And so there's no inconsistency there. And I'll note that this court made that same distinction in its Auraria student housing case. In that case, which is about essentially a form of state sovereign immunity from antitrust laws, in that case, the court held, we don't have to decide whether the collateral order doctrine would apply if the state were asserting that immunity, because private parties are asserting it in a sort of derivative way, and the interests there are different. And so under Will, under Richardson, under this court's decision in Auraria student housing, GEO's argument is essentially foreclosed. And I'll note there are two other reasons that the collateral, that GEO's argument for the collateral order doctrine doesn't apply. One is, you know, GEO is saying this is going to disrupt the government just like qualified immunity does, but the government itself disagrees. And it would be quite odd for this court to take a doctrine that's already a stretch from the text and stretch it further to protect the government when the government is saying we don't need that protection. And the other reason is that, you know, GEO's arguments fail on their own merits. If you look in the Ninth Circuit, which is where GEO says has this terrible law, GEO sued for the right to continue contracting for the government and won. And so the argument that government contractors are going to be deterred if the law is, as the Ninth Circuit says, for example, or as several other courts have said, you know, is contradicted by GEO's own conduct in this case. And it also doesn't make sense. You know, on the private market, there's no yearsly defense at all. And so the idea that companies are going to be deterred from contracting with the government simply because there's not an interlocutory appeal of a yearsly defense doesn't make sense. To turn briefly to the other prong of the collateral order doctrine, I think you asked about this, Judge Holmes, whether it is completely separable for the merits. You know, I'll note that when the Supreme Court in Mitchell and Johnson v. Jones, this court in Tucker, you know, the only aspect even of a qualified immunity appeal that's immediately appealable is the legal question. Was the law clearly established at the time? You know, as we discussed in earlier cases today, we assume a particular version of the facts. And in every qualified immunity case, there will be this legal question. On the other hand, in the yearsly context, every yearsly case is a factual question. The question is, did the conduct that the plaintiffs allege occur, did the government authorize and direct that conduct? There is essentially only a factual question in a yearsly case, at least once this court weighs in on the standard. So the whole category of cases is going to be essentially exclusively factual. And so it's much like this court's decision in clear communications or the Supreme Court's treatment of forum nonconvenience, in that both of those cases are, you know, we're looking at in the primary jurisdiction case, we're looking at whether the agency has jurisdiction over the kinds of things that the plaintiff is alleging. In the forum nonconvenience case, we're looking at whether the facts alleged by the plaintiffs, whether witnesses are going to be that kind of thing. So the idea isn't that there's 100% overlap with the merits. The idea is we're embroiling appellate courts in these kind of factual issues that are going to delay the case, that the trial court judges are much more prepared to deal with, and that ultimately aren't the kinds of legal issues that make sense to have appellate courts deciding over and over again throughout the life of the case. On what theory have they been defending against your unjust enrichment claim? Have they suggested, for example, that your clients couldn't be unjustly or that they couldn't be unjustly enriched because they were authorized and directed by ICE to do what they've done? So my understanding is that in defending against both of the claims, they have argued, look, ICE told us to do this, and so we didn't have the intent to force someone to labor. We're just trying to do what ICE told us to do. Similarly, it's not unjust. We're just trying to do what ICE told us to do. So there's both here. You know, it's not just that you're embroiling the court in the facts, but you're also embroiling them in the facts that would be on the merits as well. So both are true. And turning from the jurisdiction question to the merits question. Before we turn from the jurisdiction, am I correct in reading the district court record that they argued only immunity from damages and never argued immunity from suit? I believe that's correct, but I want to go back and double check that for you for sure. I could submit a letter if I'm wrong about that. Thank you. Sure. And just on the, you know, very briefly on the jurisdiction question, I will note that if there is, you know, in a particularly important case, there's always 1292 jurisdiction, and if the district court gets something particularly wrong, there's always mandamus jurisdiction. So this idea that just by taking out this category of orders from the collateral order doctrine is somehow going to foreclose appeals in actually important cases on important issues is not true. And GEO here did not seek either an interlocutory appeal in 1292 or mandamus. So then turning to the merits, I just, I want to focus on the standard. And that's because GEO's version of the Yearsley Doctrine, it's inconsistent with Supreme Court precedent, including the Supreme Court's decision in Yearsley. It would raise pretty serious federalism and separation of powers concern. And the policy reasons that GEO gives for adopting this doctrine just don't pan out. So first on Supreme Court precedent, you know, what Yearsley itself says, it doesn't say authorized. It says authorized and directed. And it explicitly describes the scope of liability to which it's giving a defense. It says there's no liability on the part of the contractor for executing the government's will. So it's not just there's no liability for doing something you're authorized to do. It's executing the government's will. And that's how the court understood it in Malesko. That's the case in which the court was considering whether to give a Bivens remedy for suing private contractors operating a defense, a detention facility on behalf of the federal government. And what the court said is state law is enough. You can just use regular state law to hold private detention facilities accountable. And in response to the concern, well, what if the federal government authorizes the private detention facility to violate the law? What the Supreme Court said is this, and I'll quote, there's a special circumstance in which a contractor can assert a defense. And that's where the government has directed the contractor to do the very thing that is the subject of the claim. And that's similarly, that's the only way you can make sense of the Supreme Court's decision in Boyle. If Yearsley said as long as the government says it's OK with us to do something, you have a defense to the law, Boyle wouldn't make any sense. There'd be no need for the Supreme Court to have decided Boyle at all. And there's another reason that Geo's theory of the law is inconsistent with Boyle, which is that Boyle says we don't displace state law unless there's an actual conflict with the federal interest. That's the same thing this court has said in Telfridge. And on Geo's theory, there need not be any conflict with the federal interest to displace state law. And that would raise pretty serious federalism concerns, especially when we're talking about an agency displacing state law, not Congress. You know, the Constitution says it is the law of the United States that can displace state law, not an agency's decision to authorize someone to do something. And that also points to the serious separation of powers concerns that Geo's theory would raise. You know, on Geo's view, even if an agency doesn't care whether the contractor complies with a particular law, state or federal, the agency still somehow manages to displace the laws that Congress has passed and to usurp Congress's power to decide whether or not to preempt state law. And there's a similar separation of power, or rather a second separation of powers concern, which is that courts then are coming in when the federal government is saying, no skin off our nose, no problem for us to comply with state or federal law, then courts are still coming in an area where Congress has chosen not to act. Courts are coming in and giving a defense that Congress itself has not authorized. And so both for those, you know, because the Supreme Court precedent commands this outcome, and because of the federalism and separation of powers concerns, it doesn't make sense to expand this narrow judgment doctrine. If Congress wants to give immunity, it can. And then I just want to very briefly address the policy issues that Geo raises. And I'll note, though, that the Supreme Court has explained in Brady, if there's a policy reason to give contractors immunity, Congress can do that. And so the question is, should this court step in and give Geo a defense that Congress has chosen not to give? And the main reason that Geo says, at least I heard in this argument, is, well, it's going to create a lot of work for the agency if this court does not adopt an expansive view of what Earsley covers. But, in fact, the opposite is true. You know, we would presume that agencies don't want to accidentally displace state law. They don't want to accidentally tell contractors, don't comply with federal statutes. If they're going to do that, they're going to want to do that intentionally. But on Geo's view, an agency can't set a minimum standard. It can't say, it's fine with us to do something without displacing state or federal law. And so before an agency decides to set a minimum standard or before an agency wants to answer a simple question, is something OK with you or not, it's going to have to do a lot of research about what the state law is in that area. And if it's a case in which, like ICE, it's contracting in all 50 states, it's going to have to take a look at all 50 states. Otherwise, it's going to be displacing state law and federal statutes sort of willy-nilly, not on purpose, which again raises the same federalism and separation of powers concerns. On the other hand, you know, if the Yearsley defense is construed in the same way that the Supreme Court said in Yearsley, and subsequently in Valeska, I see my time is up, may I finish this sentence? Sure. On the other hand, if the Supreme Court, you know, if you constrain Yearsley to what the Supreme Court has said, then you just have the ordinary background contracting principle that people who contract with each other follow state and federal law. And if an agency wants to displace that, it can say so. So for those reasons, unless there are any further questions. Thank you very much. Four quick points on rebuttal. The first is this last point where my friend on the other side left off, which is to create a fairly significant burden on the federal government. The authorization prong under Campbell v. Ewald in Yearsley looks to the congressional authority to do what it has done. I suggest that Article I, Section 8, Clause 4 gives Congress more than enough power to use as it has its authority in 8 U.S.C. 1231G to use private contractors. DeMori v. Kim makes clear from the Supreme Court of the United States that Congress is well within its ability to do that. The second point, oh, and by the way, on that score, see Cunningham. This notion that it's outrageous to authorize and direct contractors to violate state or federal law is fully engaged in Cunningham, where they authorized the use of an auto dialer. They didn't preclude, think about the at least language, they didn't preclude getting consent, but still grants immunity versus the TV Telephone Consumer Protection Act. The second point is Boyle. Boyle is FTCA specific. That involves a waiver of sovereign immunity. The starting point for Boyle, on which the other side relies at great length, is that a waiver has occurred. That's how this court has applied it in Creek Nation and every other court in America. Third, it can be very quick, qualified immunity, the notion that it is somehow not fact-intensive as belied by the previous four hours that I was in this courtroom. There are lots of fact questions around that and around the authorization that Congress has given to contractors who are acting pursuant to authorization and direction is no different. Regarding the unreviewability, please see Mitchell v. Forsyth, 427 U.S. at 525, which says very clearly that a denial of immunity is not, cannot be vindicated after a trial. All right. Thank you, counsel. Thank you. The case is submitted. Thank you for your fine.